## CONTINUATION OF APPLICATION FOR SEARCH WARRANT

I, David. M. Harris, being first duly sworn, hereby depose and state as follows:

### A. Introduction

1. I am employed by the Michigan Department of State Police ("MSP"). I am a certified Police Officer with the State of Michigan and have been so for approximately five (5) years. I am also a federally deputized Task Force Officer with the Federal Bureau of Investigation (FBI). I am currently assigned to the multi-jurisdictional drug task force known as the Upper Peninsula Substance Enforcement Team (UPSET). My primary duties on UPSET are to investigate and interdict the illegal manufacturing, trafficking, and possession of controlled substances. I have been on UPSET for approximately one (1) year.

2. As a member of the Michigan Department of State Police, I have the authority to investigate crimes occurring within the State of Michigan. As a Task Force Officer, I have the authority to seek and execute federal process to include search warrants and criminal complaints related to violations of Title 21 of the United States Code.

3. I have received training from the Michigan State Police in the identification of illegal controlled substances, including methamphetamine and cocaine. I have attended Basic Narcotics Investigator School, Highway Drug Investigations for Patrol, and other narcotics related training. I have investigated numerous cases involving methamphetamine, fentanyl, and cocaine sales as well as trafficking of those drugs during my time as a Task Force Officer and a State Trooper. Through my experience as a drug-trafficking investigator, I have become familiar with illegal drug terminology, packaging, and trafficking methods, as well as typical user quantities as opposed to distribution quantities of controlled substances, including methamphetamine, fentanyl, and cocaine.

4. I am currently investigating MICHAEL FOSTER (FOSTER), and others for suspected methamphetamine, fentanyl, and cocaine trafficking.

5. The information provided in this continuation is based upon my investigation and observations, as well as the investigation and observations of other law enforcement officers. Because this continuation is being submitted for the limited purpose of establishing probable cause for the issuance of the requested search warrant, I have not included each and every fact I know about this investigation.

6. This search warrant seeks authorization to search the cellular telephone described in Attachment A (the "SUBJECT DEVICE"). The SUBJECT DEVICE is more particularly described as follows:

- Samsung cellular telephone dark blue in color. IMEI number on the back of the device of 350256487652673.

7. The SUBJECT DEVICE is currently in the possession of UPSET. As further described below, it came into law enforcement's possession after it was seized by law enforcement during a traffic stop on December 28, 2024. FOSTER was arrested during this same traffic stop. I know that the SUBJECT DEVICE has been secured as evidence according to UPSET policy and procedures.

8. I respectfully submit the information set forth below establishes probable cause to believe that FOSTER, and others committed the crimes of Distribution of Methamphetamine and Fentanyl and Possession with Intent to Distribute Methamphetamine and Cocaine, in violation of Title 21, United States Code, Section 841, and Conspiracy to Distribute and to Possess with Intent to Distribute Methamphetamine and Cocaine, in violation of Title 21, United States Code, Sections 846 and 841, and that evidence, as described in Attachment B, of those crimes will be located on the SUBJECT DEVICE, as described in Attachment A.

### B. Venue

9. This Court has venue to issue the requested warrant because the property to be searched is within the district. Fed. R. Crim. P. 41(b)(1).

### C. Investigation

10. In August 2024, Detective Newton received information from a confidential informant. The confidential informant said that FOSTER is selling methamphetamine and fentanyl in Escanaba, Michigan. The confidential informant stated that FOSTER was making "drug runs" to lower Michigan to pick up Methamphetamine and Fentanyl to bring back to the Escanaba, Michigan area. When FOSTER returns from his "drug runs" from lower Michigan, he drops off large quantities of Methamphetamine to H.T. and has H.T. sell for him. The confidential informant advised that H.T. receives a "cut" of the money for selling Methamphetamine for FOSTER. Detective Newton told me that the confidential informant contacted him for consideration of working off a pending retail fraud charge in Delta County. However, after this interview, the confidential informant did not contact UPSET detectives further and did not receive consideration for their pending retail theft charge. The confidential informant has conducted controlled purchases in the past with UPSET and while working with UPSET, The confidential informant's information was found to be credible and reliable, according to UPSET detectives. The confidential informant has a felony convictions related to possession of analogues and forgery/counterfeiting, as well as numerous misdemeanor convictions.

11. On November 19, 2024, Det. Rivett and I were conducting surveillance near known address on 8th Ave South in Escanaba in Escanaba, Michigan. While conducting surveillance Det. Rivett and I witnessed a male subject wearing a black coat, baseball cap and blue jeans exit the known address on 8th Ave South in Escanaba residence. As the male subject walked southbound across 8th Avenue South, he turned westbound on the sidewalk and began talking on a cellphone. Det. Rivett and I identified the male subject as Joseph Robitaille. When Joseph Robitaille approached the intersection of 8th Avenue South and South 30th Street, a silver in color Ford Focus bearing Michigan registration (89ABL2) parked in the middle of South 30th Street and waited for Joseph Robitaille to approach the vehicle. At this time Joseph Robitaille put the phone back in his pocket and approached the front driver's side window of the silver Ford Focus. I witnessed Joseph Robitaille lean into the front driver's side window and make contact with the driver. After a short period of time Joseph Robitaille walked eastbound away from the vehicle towards his residence at known address on 8th Ave South in Escanaba. Det Rivett and I then surveilled the silver Ford Focus to a known address on 12th Street in Escanaba, Michigan.

12. I know through training and experience quick stop contacts are indicative of drug transactions and distribution of narcotics.  Furthermore, I checked license plate 89ABL2 in the Law Enforcement Information Network and confirmed the vehicle was listed as a 2008 Ford Focus and was registered to FOSTER at a known address in Escanaba, MI.

13. On November 19, 2024, UPSET Detectives and I were involved in a controlled purchase of Fentanyl from Michelle Hardwick at known address on 8th Ave South in Escanaba in Escanaba, Michigan. According to the Law Enforcement Information Network, known address on 8th Ave South in Escanaba is listed as Joseph Robitaille's registered address.  D/Tpr. Metras and I met with CS1 at an undisclosed location in Delta County, Michigan. CS1 advised that they had spoken with Michelle Hardwick and arranged a deal for one gram of Fentanyl for $250.00. CS1[1] advised that Michelle Hardwick would be getting the Fentanyl from FOSTER. CS1 was provided with $250.00 in prerecorded buy funds.

14. A "controlled buy" is conducted in the following fashion: A detective will meet and formulate a plan with the CI.  The detective searches the CI to ensure the CI does not possess controlled substances, contraband, or money.  The detective provides

---

[1] CS1 proved her/himself credible and reliable based on their accurately recounting the events of the controlled buy as confirmed by investigators physical and electronic surveillance.  CS1's work for UPSET was communicated to a prosecuting attorney and resulted in a reduction in charges. CS1 has a criminal history that includes felony drug crimes.

3

the CI with pre-recorded buy money for the purchase of controlled substances. The detective fits the CI with concealed audio and/or video recorder(s). Investigators then surveil the CI to a meeting with the suspect, where controlled substances are to be purchased.  Investigators conduct surveillance of the CI while he/she is en route to the suspect, while meeting the suspect, and after departing the suspect.  After departing the suspect, the CI and detective meet, and the CI turns over the purchased controlled substances and any remaining pre-recorded buy money to the officer.  The detective again searches the CI to ensure he/she does not have any additional controlled substances, contraband, or money. The detective debriefs the CI to obtain information relating to the delivery of controlled substances.  The detective then verifies the CI's information by reviewing the audio and/or video recording(s) and through the investigators' surveillance during the controlled purchase.

15. D/Tpr. Metras and I searched CS1 for contraband and narcotics, with nothing being located. D/Tpr. Metras and I located $0.45 on CS1. The $0.45 was held until the completion of the controlled purchase. CS1 was provided with $250.00 in prerecorded buy money and a covert recorder/transmitter.

16. UPSET detectives and I conducted physical and electronic surveillance of CS1 during the deal. CS1 walked to the known address on 8th Ave South in Escanaba residence from the briefing location. Prior to CS1 arriving at known address on 8th Ave South in Escanaba residence, UPSET Detectives observed FOSTER's silver Ford Focus parked in in the driveway bearing Michigan registration (89ABL2). When CS1 arrived at the known address on 8th Ave South in Escanaba residence, I witnessed CS1 walk up to Michelle Hardwick in the front yard and observed CS1 raise their arms out towards Michelle Hardwick. Minutes later, FOSTER's vehicle left the known address on 8th Ave South in Escanaba residence. UPSET Detectives surveilled the vehicle registered to FOSTER from the known address on 8th Ave South in Escanaba residence to 821 South 12th St. Escanaba, Michigan. I was informed by CS1 that FOSTER took the money from Michelle Hardwick and stated he was going to get the fentanyl.

17. UPSET detectives observed FOSTER's vehicle leave the known address on South 12th Street in Escanaba residence a short time later and began traveling back towards the known address on 8th Ave South in Escanaba residence. UPSET Detectives observed FOSTER's silver ford focus back at the known address on 8th Ave South in Escanaba residence. UPSET Detectives identified FOSTER entering his silver Ford Focus in the driveway and leave shortly after arriving. UPSET Detectives surveilled FOSTER leave the known address on 8th Ave South in Escanaba residence and drive back to the 812 South 12th Street residence. CS1 then soon after left the deal location.

18. I met with CS1 at the meet location. CS1 handed over the suspected Fentanyl and the covert recorder/transmitter. I searched CS1 for contraband, narcotics and money with nothing being located. I returned the previously held $0.45 to CS1. CS1 advised that he/she provided Michelle Hardwick with the prerecorded buy money and then Michelle Hardwick gave the prerecorded buy money to FOSTER. CS1 stated they waited outside until FOSTER returned. When FOSTER got back to the residence, he gave Hardwick the fentanyl. FOSTER then left the residence, and CS1 entered the garage with Hardwick. CS1 advised they saw Hardwick open the tin foil packet that she received from FOSTER. Hardwick then took some of the fentanyl from the tin foil packet and then closed the tin foil once she was done. CS1 advised that Hardwick then gave s/he the tin foil packet containing suspected fentanyl.

19. I field tested the suspected Fentanyl with a TruNarc device. The TruNarc indicated a positive result for Fentanyl Compound. Total weight of the fentanyl was 1.06 grams.

20. On December 5, 2024, UPSET detectives and I were involved in a controlled purchase of Fentanyl from FOSTER at 2300 Ludington St. (Eco Fuel Gas Station) in Escanaba, Michigan. D/Tpr. Metras and I met with CS1 at an undisclosed location in Delta County, Michigan. CS1 advised that they had spoken with FOSTER and arranged a deal for two grams of Fentanyl for $300.00. CS1 informed me that the deal was arranged over a phone call with FOSTER 906-261-8045. CS1 was provided with $300.00 in prerecorded buy funds.

21. D/Tpr. Metras and I searched CS1 for contraband and narcotics, with nothing being located. D/Tpr. Metras and I located $16.00 on CS1. The $16.00 was held until the completion of the controlled purchase. CS1 was provided with $300.00 in prerecorded buy money and a covert recorder/transmitter.

22. UPSET detectives and I conducted physical and electronic surveillance of CS1 during the deal. CS1 arrived at the Eco Fuel Gas Station and went inside near the ATM. Minutes after CS1 went inside the venue, UPSET detectives observed FOSTER's silver Ford focus pull up to the venue and park in front of the gas station. CS1 then exited the gas station and was observed getting into the backseat of FOSTER's vehicle by UPSET detectives. FOSTER's vehicle then pulled out of the gas station and onto Ludington Ave. and proceeded to travel Westbound. As FOSTER's vehicle was pulling out of the listed venue, UPSET detectives identified FOSTER as the driver of the vehicle and were unable to identify the front seat passenger that was in the vehicle. UPSET detectives followed FOSTER to the Magnuson Hotel and he parked on the side of the hotel. FOSTER was observed a short time later pulling out of the hotel parking lot by detectives. CS1 called my work phone and informed me that FOSTER had dropped

5

him off and that the deal was complete. After the deal, D/Tpr. Metras and I picked up CS1 and drove to an undisclosed de-brief location.

23. I met with CS1 at the de-brief location. CS1 handed over a white in color paper bag marked with a black stamp labeled "elevated exotics". Inside of the paper bag was a white in color paper receipt from elevated exotics with FOSTER's name on the receipt. Also inside of the bag was a folded-up piece of silver tin foil with Fentanyl inside of the tin foil. CS1 returned the provided audio/visual recording equipment. The device was stopped and seized.  I searched CS1 for contraband, narcotics and money with nothing being located. I returned the previously held $16.00 to CS1.

24. CS1 advised they met FOSTER outside of the Eco Fuel Gas Station. CS1 advised that FOSTER was sitting in his vehicle parked in front of the gas station and also observed someone else sitting in the front passenger seat. CS1 advised they got into the back seat and handed FOSTER the $300.00. FOSTER handed CS1 a white in color bag. CS1 advised that FOSTER informed them that there was an extra gram in the bag. CS1 advised they looked inside of the bag and saw a folded-up piece of tin foil inside that contained suspected fentanyl. CS1 stated that FOSTER started driving them back to the Magnuson Hotel. CS1 didn't recognize the front seat passenger and couldn't tell if it was a male or female. When FOSTER got to the Magnuson Hotel, CS1 exited FOSTER's vehicle and FOSTER left. CS1 then called my phone and informed me that the deal was complete after FOSTER left the area.

25. The below photo of CS1's phone call log shows phone calls outgoing and received from Michael FOSTER 906-261-8045, which CS1 stated is how the transaction was arranged, utilizing that telephone number for FOSTER.

6



26. I field tested the suspected Fentanyl with a TruNarc device. The TruNarc indicated a positive result for Fentanyl Compound. Total weight of the fentanyl was 3.26 grams.

27. On December 16, 2024, UPSET detectives and I were involved in a controlled purchase of Fentanyl from FOSTER at 2704 Eighth Ave. in Escanaba, Michigan. D/Tpr. Metras and I met with CS1 at an undisclosed location in Delta County, Michigan. CS1 advised that they had spoken with FOSTER and arranged a deal for one gram of Fentanyl for $300.00 and was going to ask FOSTER for a half gram of methamphetamine for $50.00 during the deal. CS1 informed me that the deal was arranged over the phone with FOSTER 906-261-8045. CS1 was provided with $350.00 in prerecorded buy funds.

28. D/Tpr. Metras and I searched CS1 for contraband, money, and narcotics, with nothing being located. CI was provided with $350.00 in prerecorded buy money and a covert recorder/transmitter.

7

29. UPSET detectives and I conducted physical and electronic surveillance of CS1 during the deal. CS1 walked to a known location on 8th Ave in Escanaba. from the briefing location. CS1 was observed walking into the residence by UPSET detectives. Prior to CS1 arriving at the venue, UPSET detectives observed FOSTER's silver ford focus parked at the Marshall's store in Escanaba. UPSET detectives positively identified FOSTER as the driver of the vehicle with two other female occupants in the vehicle. FOSTER's vehicle was then observed driving to the Store Gas station and then to the address of known location on S 12th St in Escanaba. FOSTER and the two females were observed by detectives exiting the car and entering the residence. FOSTER was then observed a short time later leaving the residence and UPSET detectives followed him to a known location on 8th Ave in Escanaba after making one stop at a different residence.

30. After FOSTER arrived at a known location on 8th Ave in Escanaba, UPSET detectives could hear CS1 making contact with a male voice inside of the residence on the recording device. UPSET detectives heard CS1 ask, "you got a 50 of the other stuff?" The male voice responded by saying, "oh no you might as well get it from Joe." CS1 then stated, "I couldn't get ahold of ya" and the male voice responded by saying, "yeah get it from Joe."  FOSTER was then observed by detectives leaving the residence. CS1 was also heard on the recording device approaching another male voice and asked, "want to get rid of a 50" The person could be heard responding by saying "oh yeah". Minutes later CS1 could be heard asking the male voice "you got a bag?" and the person responded by saying "right there".

31. A CI debriefing was conducted at an undisclosed location. CS1 immediately provided me with a folded-up piece of silver tin foil and a clear mini zip lock plastic baggie with a clear crystal-like substance suspected to be methamphetamine. CS1 returned the provided audio/visual recording equipment. The device was stopped and seized. CS1 advised they met Joseph Robitaille inside of the residence. CS1 advised that Joseph Robitaille was going to be buying methamphetamine from FOSTER. CS1 advised that when FOSTER arrived, they gave him $300.00, and FOSTER handed CS1 a folded-up piece of silver tin foil. CS1 then observed FOSTER give Joseph Robitaille methamphetamine. CS1 advised that they asked FOSTER if he had a "50" of methamphetamine on him that they could buy, and FOSTER told them that they would have to get it from Joseph Robitaille. CS1 advised that FOSTER then left the residence.  CS1 then approached Joseph Robitaille to see if he would be willing to sell a "50" of methamphetamine. Joseph Robitaille informed CS1 that he would sell them methamphetamine. CS1 advised that Joseph Robitaille opened a bag of methamphetamine up by a weigh scale and had CS1 package and weigh the methamphetamine in front of him. CS1 advised they gave Joseph Robitaille $50.00 for a half gram of meth and then left the deal location.

32. Attached below is a photo of CS1's phone call log showing phone calls outgoing to FOSTER 906-261-8045. CS1 stated the phone calls were made to arrange the controlled purchase with FOSTER, and I took a picture of the calls recently made on his phone at the time:



33. I field tested the suspected Fentanyl and Methamphetamine with a TruNarc device. The TruNarc indicated a positive result for Fentanyl Compound and Methamphetamine. Total weight of the fentanyl was 1.26 grams. Total weight of the methamphetamine was .88 grams.

34. On December 19, 2024, UPSET detectives and I were involved in a controlled purchase of methamphetamine from FOSTER at an address on Gijik Rd. in Escanaba, Michigan. Det. Rivett and I met with CS2[2] at an undisclosed location in Delta County, Michigan. CS2 advised that they had spoken with FOSTER and arranged a deal for one gram of methamphetamine for $100.00. CS2 informed me

---

[2] CS2 proved her/himself credible and reliable based on their accurately recounting the events of the controlled buy as confirmed by investigators physical and electronic surveillance. CS2 was working off a pending retail fraud charge, which was dismissed based on her cooperation with authorities. CS2 has a deferred felony conviction for possession of a controlled substance analogue.

9

that the deal was arranged over the phone with FOSTER 906-261-8045. CS2 was provided with $100.00 in prerecorded buy funds.

35. Det. Rivett and I searched CS2 for contraband and narcotics, with nothing being located. CS2 had $285.00 that was held prior to the controlled delivery. Det. Rivett searched CS2's vehicle and no contraband or money were located in the vehicle. CS2 was provided with $100.00 in prerecorded buy money and a covert recorder/transmitter.

36. UPSET detectives conducted physical and electronic surveillance of CS2 during the deal. CS2 drove to the Store Gas Station where the deal was originally supposed to take place. CS2 called FOSTER while at the gas station and FOSTER informed CS2 to meet him at the listed venue. Prior to CS2 calling FOSTER, UPSET detectives observed FOSTER driving his silver ford focus towards the direction of the known address on Gijik Rd. FOSTER was positively identified by UPSET detectives at this time. The CI then drove to the known address on Gijik Rd. and was observed by UPSET detectives pulling into the driveway. FOSTER's silver Ford Focus was also observed parked in the driveway. CS2 could be heard knocking on the door and entering the residence from the recording device. CS2 could be heard from the recording device, contacting FOSTER inside of the residence. A short time later, CS2 could be heard leaving. While CS2 was leaving, FOSTER could be heard on the recording device leaving as well while talking to CS2 outside. FOSTER was observed leaving in his silver Ford Focus by UPSET detectives.

37. A CI debriefing was conducted at an undisclosed location. CS2 immediately provided me with one clear mini zip lock plastic baggie with orange basketballs on it. CS2 also provided me with the $100 in UPSET buy funds that was supposed to be used to purchase the methamphetamine. Inside of the baggie was a clear crystal-like substance suspected to be methamphetamine. CS2 returned the provided audio/visual recording equipment. The device was stopped and seized.

38. CS2 advised they met FOSTER inside of the residence. They advised that they spoke to FOSTER for a little bit while inside of the residence. FOSTER walked back into the kitchen of the residence where CS2 observed methamphetamine and a weigh scale on the kitchen counter. CS2 advised that they saw approximately a couple grams on the counter that was unpackaged next to the scale. CS2 observed FOSTER put methamphetamine on the scale and then package it. FOSTER then provided the methamphetamine to CS2 and informed CS2 that it would be at no cost.

39. I searched CS2, and no money, drugs or contraband were located on their person. CS2 was given the $285.00 that was held prior to the deal. Det. Rivett searched CS2's vehicle and no contraband or money were located in the vehicle.

40. Find below photo of CS2's text messages to FOSTER 906-261-8045 to arrange the controlled purchase:



41. I field tested the suspected Methamphetamine with a TruNarc device. The TruNarc indicated a positive result for Methamphetamine. Total weight of the methamphetamine was 2.29 grams.

42. On December 28, 2024, Tpr. Vargo and Sgt. Belonga of the MSP Traffic Safety Team conducted a traffic stop on FOSTER's 2008 Ford Focus with Michigan license plate 89ABL2 on US-2 Hwy / US-41 Hwy in Rapid River, Michigan. S.S. was identified as the driver of the vehicle and FOSTER was identified as the passenger of the vehicle. Deputy McDonough's canine of the Delta County Sheriff's Dept. alerted on the vehicle. A subsequent search of the vehicle revealed that there

11

was approximately one pound of methamphetamine and an ounce of cocaine inside of the vehicle. OSTER was arrested on scene for a parole violation and lodged at the Delta County Jail. S.S. was released from the scene. The SUBJECT DEVICE was located on the dash of the car in front of the front passenger seat where FOSTER was sitting. SUBJECT DEVICE was seized by Tpr. Vargo and then turned over to me after the traffic stop was completed.

43. On January 7, 2025, Det. Rivett and I ran a certified criminal history (CCH) on FOSTER in the Law Enforcement Information Network (LEIN) and observed that FOSTER is currently on parole in Delta County, Michigan. On April 4, 2016, FOSTER was sentenced to 10 months' probation for one count delivery/manufacture schedule IV narcotics (MCL: 333.74012-A) in Delta County. On May 9, 2022, FOSTER was sentenced 3-20 years in prison for two counts of delivery/manufacture cocaine, heroin or other narcotics (MCL: 333.74012A4) in Delta County.

44. On January 13th, 2025, Drug Enforcement Administration Task Force Officer Cole Hodge received subscriber information and phone records for phone number 906-261-8045 with Administrative Subpoena number IC-25-111721. The data received by Verizon showed the account holder information is held by Tracfone Wireless. The device information for the phone number provided by Verizon shows that the IMEI number associated with 906-261-8045 is 350256487652673. The device is listed as a Samsung A15 SM-A156 U1 UNL. The date range of the information received from Verizon for phone number 906-261-8045 shows that the account was activated on November 2, 2024. Verizon did not list a deactivation date as of December 29, 2024. The IMEI number that I observed on the back of the SUBJECT DEVICE is the same IMEI number that was provided by Verizon. Furthermore, the make and model of the device provided by Verizon is consistent with the make and model of the SUBJECT DEVICE.

45. On January 15, 2024, a State of Michigan search warrant authorized a search of the SUBJECT DEVICE. On January 16, 2025, the device was brought to the Michigan State Police Computer Crimes Unit in Marquette, Michigan for a forensic acquisition. I was later informed by the Computer Crimes Unit that they were unable to obtain a forensic acquisition from the SUBJECT DEVICE. However, Michigan State Police were able to determine the SIM card for the SUBJECT DEVICE was associated with phone number 906-261-8045, which indicates that was the phone number of the SUBJECT DEVICE.

46. On December 28, 2024, investigators obtained authority to search S.S.'s, following the traffic stop of her and FOSTER. On January 7, 2025, the device was brought to the Michigan State Police Computer Crimes Unit in Marquette, Michigan for a forensic acquisition.

12

47. On February 6, 2025, I reviewed the forensic acquisition of S.S.'s phone. I observed drug communication between S.S.'s device and "Mike" with phone number 906-261-8045, believed to be used by FOSTER.

48. For example, on December 22, 2024, 906-261-8045 saved as "Mike" messages S.S.'s device and asks where she is. S.S.'s device asks, "Can u come here" and "Can I get a ball of up and 100 of down." Through my training, research, and experience, including my knowledge of this investigation and the controlled purchases of methamphetamine and fentanyl discussed in this continuation from FOSTER, I understand this message to be S.S. asking for 3.5 grams of a stimulant drug and $100 worth of a depressant drug. More specifically I know that "up" is common slang for methamphetamine and that "down" is common slang for heroin/fentanyl in drug communication. See below images:



49. On December 26, 2024, S.S.'s device messages "Mike" at 906-261-8045 and says, "Hey could we meet up? I'm looking for a g [arrow up emoji]." "Mike" replies, "Yo foe the last time stop texting that shit to my phone just call and say what you gotta say." See below image:



50. I know from training, experience, and research that "a g [up emoji]" is common slang in drug communication. Further, "Mike" tells S.S.'s device to not text that "shit." In this case based on my training and experience and knowledge of the investigation S.S. is trying to arrange to buy at least a gram quantity of a drug from "Mike." Further, in my training and experience, "Mike's" response directing S.S. to stop texting in response to a message regarding drugs, is indicative of Foster's consciousness of guilt.

51. On December 28, 2024, S.S.'s device messages "Mike" and asks if they can head back because her parents have been texting her. "Mike" tells her they are about to leave. See below image:



52. As previously mentioned, S.S. and FOSTER were arrested on return from a drug run on December 28, 2024, when a distribution amount of methamphetamine and cocaine was seized from their vehicle.

53. In November 2025, I was informed by the MSP Computer Crimes Unit, that they have updated their software, which allows them a greater likelihood to obtain a forensic acquisition from the SUBJECT DEVICE.

54. Based on my training, experience, and research, I know that cellular telephones have capabilities that allow them to serve as a wireless telephone, to serve as a digital camera and video camera, to access the Internet, to store electronic documents and files, to be used as a calendar/schedule appointments, and to do many of the same tasks that a computer can do. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

55. Based on my training and experience, persons involved in narcotics trafficking utilize cellular telephones to further their drug activities. More specifically, I

know that drug distributors and members of drug conspiracies use cellular telephones to further the conspiracy, including by:

  a. Retaining records of their financial transactions, including money order receipts, cashier's checks, titles, deeds, automobile titles and registrations, hotel and airline receipts and wire transfer receipts. These records are often stored on cellular phones. These records are often retained for a number of years;

  b. Communicating with other co-conspirators (e.g., suppliers, couriers, and recipients of controlled substances) by talking and by sending e-mail messages, text messages, and messages through social media (e.g., Facebook) and other cellular phone applications;

  c. Storing contact information of co-conspirators, customers, and/or suppliers;

  d. Taking photographs of co-conspirators and contraband;

  e. Using the internet to make purchases and transfer money with other co-conspirators, customers, and/or suppliers;

  f. Storing location information, including data obtained and saved through the use of mapping applications to navigate to "meet spots" and

  g. Maintaining addresses or telephone numbers in their cellular phones which reflect names, addresses and/or telephone numbers of their suppliers, customers and criminal associates in drug trafficking, and often possess photographs of other co-conspirators. These records are often retained for a number of years;

  h. Maintaining books, records, receipts, notes, ledgers, airline tickets, money orders, passports and other papers relating to the transportation, importation, ordering, sale and distribution of controlled substances, and the laundering of the resulting drug proceeds, and that these are likewise kept in electronic form on electronic devices like cellular phones; and

  i. In general, using their cellular phones to aid them in their drug trafficking activities. Through computer forensic examination, I know that law enforcement experts can recover material from cellular phones, to include items/documents/files that the user has attempted to delete.

### D. Electronic Storage and Forensic Analysis

56. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

57. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.

    e. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    f. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

58. I know that when an individual uses an electronic device to facilitate drug transactions and, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

59. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

    a. Michigan State Police (MSP) Computer Crimes Unit (CCU) detectives are certified in various extraction methods including, but not limited to Cellebrite's Universal Forensic Extraction Device (UFED), a forensics tool used to extract data from smartphones, tablets and portable GPS devices.

    b. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information.

    c. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment A, or perusing all stored information briefly to determine whether it falls within the scope of the warrant.

    d. In light of these difficulties, the MSP Computer Crimes Unit intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

60. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

### E. Conclusion

61. I submit that this Continuation supports probable cause to believe that MICHAEL FOSTER, and others committed the crimes of Distribution of and Possession with Intent to Distribute Methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841, and Conspiracy to Distribute and to Possess with Intent to Distribute Methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 846 and 841. Further, I submit the is probable cause to believe evidence of those crimes, as defined in Attachment B, will be found on the SUBJECT DEVICE further described in Attachment A.